Dale W. DECKER, Relator,

v.

CITY PAGES, INC., Commissioner of
Economic Security, Respondents.

No. CX–95–1127.

Court of Appeals of Minnesota.

Dec. 12, 1995.

Joseph T. O'Neill, O'Neill, Burke, Leonard & O'Brien, St. Paul, for Dale W. Decker.

Robert L. Meller Jr., Best & Flanagan, Minneapolis, for City Pages, Inc.

Kent E. Todd, St. Paul, for Commissioner of Economic Security.

Considered and decided by DAVIES, P.J., and NORTON and THOREEN*, JJ.

## OPINION

NORTON, Judge.

We granted this writ of certiorari to review the decision of the Commissioner of Economic Security holding that relator was ineligible for reemployment benefits, because he was self-employed and not sufficiently attached to the traditional work force to demonstrate he was actively seeking and available for suitable full-time work. The record and law do not support the Commissioner's decision. We reverse.

## FACTS

In September 1992, relator Dale W. Decker left a management position at the *St. Paul Pioneer Press* and became an associate publisher for respondent City Pages at an annual salary of approximately $60,000. In May 1994, City Pages notified Decker that it had decided to exercise its option under the employment contract to terminate his employment effective June 25, 1994. Pursuant to the terms of the employment contract, Decker continued to receive his salary through September 8, 1994.

Decker started searching for other suitable employment in June. In August, he purchased the name and trademark of an advertising industry magazine named *Format*, which had ceased business earlier that same year. He worked part time on a project for the Minneapolis Downtown Council (MDC) from approximately August 29, 1994, until November 1994. He then filed a claim for reemployment insurance benefits with the Department of Economic Security on November 6.

At the time Decker filed his claim, he advised the Department claims adjudicator that he and his wife owned a magazine business and that he was devoting approximately 20 hours per week in the furtherance of that venture, but that he was available for and actively seeking full-time suitable work in the field of newspaper marketing. He stated that his business would not interfere with his ability to look for or perform full-time work. Based upon these representations, the claims adjudicator determined that Decker was eligible for benefits. The eligibility factfinding report states that the adjudicator advised Decker to report earnings when earned and to provide information pertaining to his work search efforts on a bi-weekly basis.

City Pages appealed the claims adjudicator's decision to a Department reemployment insurance judge, who conducted a hearing. The judge received evidence and testimony by Decker and the publisher of City Pages.

Decker testified that he reported his work search efforts on a bi-weekly basis as required. These efforts consisted of "networking" with three local publishers and two newspaper chains. Decker testified that the interview process with these publications extended over a number of occasions and included conversations by telephone and over lunch. Decker provided these contacts with a copy of his resume and told them about his efforts to publish *Format*, but explained that he continued to be available for other options, such as independent employment opportunities or having his magazine come under the umbrella of a larger publishing company. Decker also discussed advertising for his magazine with two of these contacts. Decker submitted a letter from one contact who stated:

> I'm going to leave your credentials in an active status at this end, Dale. We will continue to operate under the assumption that you are available for employment. If your magazine venture works out and you decide to take the plunge, would you

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

please let us know? Even if that's the case, one never knows what the future might hold ... and it would be helpful for us to know where you are and what you're doing.

Decker admitted that his work search efforts during the period in question did not include contacting *Minneapolis/St. Paul* magazine, the *Star Tribune, Skyway News, Corporate Report, City Business,* or his former employer, the *St. Paul Pioneer Press.* He did, however, explain why he did not contact each one of those publishers, including his knowledge that the few suitable positions at many of those publications had been recently filled or were traditionally filled by internal promotion. Decker also admitted he was aware that, in November 1994, the *St. Paul Pioneer Press* was soliciting applications for the position of display advertising sales manager. He explained, however, that the position was beneath the management position he had when he left the newspaper.

The first issue of *Format* was published at the beginning of February 1995. Decker stopped all claims of reemployment benefits effective January 28, 1995.

The reemployment insurance judge affirmed the claims adjudicator's grant of benefits to Decker. City Pages appealed to a Commissioner's representative, who issued findings of fact and a memorandum reversing the reemployment insurance judge's decision.

The Commissioner's representative found that Decker was self-employed and no longer seeking other suitable work after he applied for reemployment insurance benefits in early November 1994. The Commissioner's representative determined that Decker had restricted his availability for work and that his work search efforts did not represent a genuine commitment or connection to the labor market. The Commissioner's representative concluded that Decker was not eligible to receive reemployment insurance benefits.

## ISSUES

1. Did the Commissioner's representative properly conclude that Decker has the burden to establish that he was available for and actively seeking work?

2. Does the record support the Commissioner's representative's decision that Decker was not eligible to receive benefits, because he was not available for work and was not actively seeking work?

## ANALYSIS

### I.

The employee has the burden to prove he or she is eligible to receive reemployment insurance benefits; the employer has the burden to prove the employee is disqualified from benefits. *Ykovchick v. Public Schs.,* 312 Minn. 139, 141, 251 N.W.2d 626, 628 (1977); *see also Kleinwachter v. Department of Employment Servs.,* 305 Minn. 568, 570 n. 2, 234 N.W.2d 822, 824 n. 2 (1975) (providing that claimant has burden of proving average weekly net income during period of claim for benefits, because "claimant should have the burden of proving eligibility").

Decker contends that he satisfied the eligibility requirements of the statute when he applied for and was approved for receipt of benefits and when he thereafter supplied the required bi-weekly reports of his job search activities. He claims that the burden of proof shifted to the employer once the claim adjudicator and reemployment insurance judge accepted his evidence as credible and authorized the payment of benefits. We disagree.

A claimant's registration and submission of periodic reports to a claim office is only one of the five factors the claimant must prove to demonstrate eligibility for receipt of reemployment insurance benefits. *See* Minn. Stat. § 268.08, subd. 1 (1994) (listing five requirements to establish eligibility for benefits). A claimant also must demonstrate, on a continuing basis, that he or she was "available for work, and was actively seeking work" for "any week" he claims benefits. *Id.* Thus, Decker has the burden to show he sought and was available for work throughout the period he received benefits.

Finally, Decker's reliance on *Adelsman v. Northwest Airlines,* 267 Minn. 116, 123, 125 N.W.2d 444, 449 (1963) is unfounded. Deck-

er seeks to rest his argument on the statement in *Adelsman* that "[w]here disqualification is claimed, the employer has the burden of proving the requisite facts to bring the employee within the statutory deprivation of benefits." *Id.* This rule does not apply here. As *Adelsman* recognizes, the issue of disqualification is distinct and separate from the issue of eligibility. *Compare* Minn.Stat. § 268.08, subd. 1 (eligibility) *with* Minn.Stat. § 268.09 (1994) (disqualification); *see also Ykovchick*, 312 Minn. at 141, 251 N.W.2d at 628 (employee bears burden to prove eligibility; employer bears burden to prove disqualification).

## II.

The focus of the eligibility issue here is whether Decker met his burden to show he was available for, and actively seeking, work. The Commissioner's representative found that he did not. We are mindful that

> [w]here the Commissioner's representative has made a determination regarding a claimant's availability for work, that determination should not be disturbed if it is reasonably supported by the evidence.

*Honeywell v. Hoyhtya*, 400 N.W.2d 818, 821 (Minn.App.1987) (citing *Semanko v. Department of Employment Servs.*, 309 Minn. 425, 428, 244 N.W.2d 663, 665 (1976)). While the Commissioner has the authority to modify or set aside a reemployment insurance judge's findings of fact or decision, or both, the Commissioner may only do so "on the basis of the evidence previously submitted in the case." Minn.Stat. § 268.10, subd. 5 (1994). The record and law do not support the Commissioner's decision here.

The purpose of the statute governing reemployment insurance, the Minnesota Economic Security Law, guides our review of the Commissioner's representative's decision. That statute "is remedial in nature and should be construed liberally to carry out the public policy of Minn.Stat. § 268.03 * * *." *Valenty v. Medical Concepts Dev.*, 503 N.W.2d 131, 134 (Minn.1993). The Minnesota Economic Security Law "is intended to benefit persons who are unemployed through no fault of their own and who are genuinely

attached to the labor market." *Olson v. Starkey*, 259 Minn. 364, 371, 107 N.W.2d 386, 391 (1961). Here, the Commissioner's representative seems to have lost sight of this purpose.

"The basic purpose of the availability requirement is to test the claimant's attachment to the labor market." *Flores v. Department of Jobs & Training*, 411 N.W.2d 499, 502 (Minn.1987). While this generally refers to the traditional labor market, the law recognizes that a self-employed person may demonstrate availability for work if the person is willing to accept an offer of employment, "in the sense that [the claimant] is in a position to accept work." *Id.* at 502–03. Except where a claimant's physical or mental condition restricts his or her availability,

> a claimant is considered available for work only if ready and willing to accept full-time suitable work. There must be no restrictions, either self-imposed or created by circumstances, which prevent accepting full-time work.

Minn.R. 3305.0500, subpt. 1 (1993) (referring to Minn.R. 3305.0400, subpt. 2 B. (1993)). "A claimant must offer services unequivocally to the labor market to be available for work." *Id.*, subpt. 8. A person "is not available for work if self-employed and no longer seeking other suitable work or if planning to become self-employed and will not accept other suitable work." *Id.*, subpt. 11. Further, as the duration of unemployment lengthens, work that was originally unsuitable may be deemed suitable and the claimant may have to broaden the geographic area in which he will accept work. *Id.*, subpt. 9.

The term "actively seeking work" is generally defined in Minn.R. 3305.0600 (1994). Relevant sections of that rule state:

> A claimant must make reasonable, diligent efforts to actively seek suitable work for each week for which he or she files a claim. Reasonable, diligent efforts are those that a person in similar circumstances would make if genuinely interested in obtaining suitable employment under the existing conditions in the labor market area. A claimant who fails to make reasonable, diligent efforts to actively seek suitable work

or who limits the search to positions that are not available or are above the claimant's training, experience, and qualifications is not actively seeking suitable work.

\* \* \* \* \* \*

The number of employer contacts required to be considered actively seeking employment varies. In determining adequacy of work search in terms of the number of contacts required the department will consider the employment opportunities as well as the qualifications of the claimant and normal practices and methods of seeking work.

*Id.,* subpts. 1, 3.

Here, Decker unequivocally testified that he remained available for, and would have accepted, suitable full-time employment during the 11–week period he sought and received reemployment benefits. He testified that he had multiple telephone and in-person "networking" contacts with five prospective employers during this period. He had formal interviews with one employer in November. He explained that he interviewed for an out-of-town position and that he would have relocated for that position. Nevertheless, the Commissioner's representative found that Decker was unavailable for work and not actively seeking work. In doing so, he made erroneous presumptions and assumptions not supported by the record.

The Commissioner's representative found it "totally unbelievable" that Decker worked only 20 hours per week and expended "less than his full-time energies" on *Format* during the 11 weeks he collected reemployment benefits immediately prior to publication. The Commissioner's representative was apparently persuaded by testimony of the publisher of *City Pages,* who stated that he had launched several publications and that his efforts to do so involved approximately 60 to 70 hours of his time per week. But those publications were start-up publications, whereas Decker's efforts went toward re-starting a 40–year–old trade magazine that had recently stopped publication.

To demonstrate Decker's efforts, the Commissioner's representative noted that the first issue of Decker's magazine contained 32 pages, including 23 pages of advertising from approximately 25 advertisers. But, again, the Commissioner's representative has failed to take into account that Decker's identification and solicitation of advertisers for the re-start of *Format* likely involved much less effort than soliciting new advertisers for a start-up publication. Instead, the Commissioner's representative made assumptions about the time and effort Decker "presumably" made based on faulty speculation and evidence not contained in the record. Further, the Commissioner's representative erroneously found that Decker wrote some of the articles that appeared in the first edition of *Format.* Instead, the record shows that Decker only assisted in writing a prototype for *Format.*

Finally, the Commissioner's representative found that, in addition to soliciting advertisers, Decker was *"[p]resumably \* \* \* busy"* performing a "myriad" of tasks. The Commissioner's representative only identified the tasks of hiring staff, contracting for materials and supplies, and arranging for printing and circulation. Again, the Commissioner's representative has made erroneous assumptions outside the record. These tasks are not necessarily time-consuming given Decker's experience and the fact he was re-starting an established publication. The first edition of *Format* lists only two staff in addition to Decker and his wife, who were co-publishers. This record does not support the finding that Decker expended his full-time energies on *Format* and was therefore unavailable for other work.[1]

The Commissioner's representative determined that Decker restricted his availability for work by refusing to consider positions less than publisher and advertising director, by refusing to follow-up on a lead for a "suitable" position with his former employer, and by unduly restricting his salary range to over $60,000 after he had been unemployed

---

1. To further demonstrate this point, we note Decker testified that his wife, as co-publisher, could have taken over the publishing task, if necessary, thus allowing for his availability to accept full-time employment. The record contains no evidence to refute this fact.

for an extended period of time. The record does not support these findings.

First, Decker testified that he would consider a salary lower than $60,000 if the work were suitable. Second, the work available at Decker's former employer, the *St. Paul Pioneer Press,* was in a position inferior to the one Decker had last occupied there and was presumably for less pay.[2] Third, the work at the *St. Paul Pioneer Press* was not suitable;[3] Decker's failure to follow up on that lead does not demonstrate unavailability for work.

Finally, Decker originally followed a narrower traditional approach to reemployment. He worked at the MDC while interviewing with employers. When the MDC job ended, Decker started selling advertising for his magazine, he put together a magazine prototype with the help of friends, and he continued to interview and network with prospective employers. He applied for and received reemployment benefits after honestly disclosing to the department's agent that he would be working to re-start *Format,* while he would also continue to seek and be available for other suitable full-time employment. This record demonstrates a creative expansion of efforts and reemployment prospects and does not support a finding of restricted availability and search efforts.

The Commissioner's representative found that Decker's contacts with only five prospective employers during the 11–week benefit period was an inadequate job search effort. But the Commissioner's representative failed to recognize that two of these employers, *Knight Ridder* and *Gannet,* reached a network of over 100 publications. This record does not sustain the finding that the number of Decker's contacts was inadequate.

The Commissioner's representative also noted that Decker admitted his search efforts did not include contacting *Minneapolis/St. Paul* Magazine, the *Star Tribune, Skyway News, Corporate Report,* or *City Business.* But Decker explained why he did not contact each publication. He provided uncontroverted testimony that these publica-

tions had recently filled the few positions suitable for him or had traditionally filled those positions by internal promotion.

Finally, the Commissioner's representative speculated that Decker's networking with prospective employers about employment as well as about *Format* and business merger opportunities sent a mixed signal concerning the seriousness of his desire for employment and demonstrated his unavailability for work. *See* Minn.R. 3305.0500, subpt. 8 ("claimant must offer services unequivocally to the labor market area to be available for work"). But Decker's testimony and the letter from *Gannet* contradict this finding. In that letter, the newspaper chain's representative stated that *Gannet* would keep Decker's "credentials in an active status" and "operate under the assumption that you are available for employment" even though the letter also acknowledged Decker's efforts to re-start *Format.*

In conclusion, Decker's approach to reemployment was creative. He pursued the traditional labor market path, while at the same time he pursued an entrepreneurial approach to set up his own business. The Commissioner's representative did not appear to appreciate the fact that the efforts Decker put into creating a business were equivalent to searching for employment. The law does not require an unemployed individual to take only the traditional route to reemployment. The Commissioner's representative's narrow and rigid approach is not in conformity with the Minnesota Economic Security Law's purpose to be remedial in nature and to serve those who are unemployed through no fault of their own. Her approach fails to follow the directive that the statute "should be liberally construed" to carry out its remedial purposes. *Valenty,* 503 N.W.2d at 134.

Using his two-pronged approach, Decker managed to become reemployed after receiving only eleven weeks of benefits. We believe it is improper to penalize someone for taking, as Decker did here, a creative two-

---

**2.** The record contains no evidence regarding salary for the advertised position.

**3.** The record contains no evidence to support the Commissioner's representative's finding that the inferior job at the *St. Paul Pioneer Press* was suitable.

pronged, entrepreneurial and traditional approach to obtaining employment.

## DECISION

The record and law do not support the Commissioner's decision that Decker was not available for and actively seeking suitable employment. Decker's creative efforts, seeking and being available for reemployment in the traditional job market while also being self-employed in an effort to re-start a magazine, demonstrated his eligibility for benefits. We reverse the Commissioner's decision and reinstate the original award of benefits to Decker.

**Reversed.**